## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **NICOLE AND GREG BABIN, ET AL** | : | **DOCKET NO. 2:04 CV 1595** |
| **VERSUS** | : | **JUDGE TRIMBLE** |
| **ECOLAB, INC., ET AL** | : | **MAGISTRATE JUDGE WILSON** |

### MEMORANDUM RULING

Presently before the court is Ecolab Inc.'s Motion for Summary Judgment. (Doc. 35). This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(c).

Plaintiffs Nicole Babin and Melissa Smith worked together on the cardiology floor of Christus St. Patrick's Hospital in Lake Charles. They both became pregnant about June 2003. Tragically, both babies developed anencephaly which precluded the babies' survival. In this action Plaintiffs take the position that their babies developed anencephaly as a result of the mothers' exposure to an institutional floor wax stripper manufactured by defendant, Ecolab, Inc. Ecolab Inc. (Ecolab) has filed the motion presently before the court contending that there is no genuine issue of fact material to the issue of general causation.[1]

### Summary Judgment Principles

Summary judgment is proper if the movant demonstrates that "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is

---

[1] Originally, defendant contended that summary judgment was appropriate due to a lack of a genuine issue as to both general causation and specific causation. It has now withdrawn that portion of its motion seeking summary judgment based on specific causation. *See* 6/28/05 minute entry.

no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Lechuga v. Southern Pacific Transp. Co.*, 949 F.2d 790 (5th Cir. 1992). Moreover,

> [f]or any matter on which the non-movant would bear the burden of proof at trial, . . . the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party" is a full trial on the merits warranted.

*Transamerica Insurance Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995)(citing, *Celotex Corp. v. Catrett,* 477 U.S. 317, 333-34, 106 S.Ct. 2548, 2558 (1986)).

The non-movant, may not rest upon the mere allegations or denials contained in her pleadings, but instead must set forth, by affidavit or otherwise, the specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In other words, once the moving party points to an absence of evidence in the nonmoving party's case, the nonmovant must come forward with summary judgment evidence sufficient, such that if introduced at trial, it would suffice to prevent a directed verdict against the nonmovant. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

## Discussion

The Louisiana Products Liability Act (LPLA), La.R.S. 9:2800.51 et seq., provides the exclusive basis for liability of a manufacturer for damage caused by its product. La.R.S. 9:2800.52. Plaintiffs bear the burden of proving that their damage was "proximately caused" by the defendant's product. La.R.S. 9:2800.54. Defendant argues that even if it is assumed that Plaintiffs were exposed to Defendant's product at a relevant time Plaintiffs have failed to produce competent summary judgment evidence that would support a finding that Defendant's product was the most likely cause of anencephaly in Plaintiffs' children.

2

In opposing Defendant's motion Plaintiffs primarily rely on the affidavity of Dr. James Dahlgren, a toxicologist. For present purposes the most significant representations by Dr. Dahlgren include:

1. Glycol ethers are a known tetatogen and are toxic.

2. Glycol ethers have been shown to cause birth defects in both animals and humans.

3. In humans glycol ethers are associated with Neural Tube Defects.

4. Plaintiffs were probably exposed to 2-methoxyethanol (2-ME) and/or 2-ethoxyethanol (2-EE).

5. Inhalation of glycol ethers "more probably than not have caused injury to Plaintiffs' unborn babies."

Defendant has responded with the affidavit of William Phillips. This affidavit establishes:

1. Defendant's product does not and has never contained 2-ME, 2-EE.

2. The only glycol ethers in defendant's product are ethylene glycol phenyl ether and diethylene glycol phenyl ether.

3. The glycol ethers found in Defendant's product each contain a phenyl functional group not found in the specific glycol ethers mentioned by Dr. Dahlgren.

4. The glycol ethers found in Defendant's product will be metabolized differently than 2-ME and 2-EE and will have different toxicological properties.

3

After a careful review of the record this court concludes that Plaintiffs have failed to establish that a genuine issue of fact exists as to whether Plaintiffs' exposure to Defendant's product caused the defect in, and subsequent death of, their children.

Glycol ethers are a family of some 40 different chemicals. Various members are found in a wide range of domestic and industrial products. Exhibit C to Dahlgren Affidavit, p 361. Dr. Dahlgren was unable to obtain information on the specific glycol ethers contained in Defendant's product and Plaintiffs propounded no discovery to obtain that information. Consequently, Dr. Dahlgren made an erroneous assumption about the particular glycol ethers involved.[2] This alone substantially undermines Dr. Dahlgren's conclusions regarding whether or not Defendant's product could have caused anencephaly in Plaintiffs' children.

"Even minor deviations in molecular structure can radically change a particular substance's properties and propensities." *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 990 (8th Cir. 2001) (citing *Schudel v. General Elec. Co.*, 120 F.3d 991, 996-97 (9th Cir. 1997). *See also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999). The summary judgment evidence is undisputed that the glycol ethers found in Defendant's product have different toxicological properties than 2-ME and 2-EE which were mentioned by Dr. Dahlgren. Affidavit of William H. Phillips. Neither Dr. Dahlgren's affidavit nor the materials attached to it support the conclusion that the identification of the specific glycol ether at issue is immaterial to the issue of causation in this case. One study relied on by Dr. Dahlgren indicated that relatively

---

[2] Dr. Dahlgren's affidavit makes it clear that his "opinion" as to the specific glycol ether contained in Defendant's product is little more than speculation. In any event the competent summary judgment evidence before the court would not support a finding that Defendant's product contains any glycol ether other than the two identified in Mr. Phillips' affidavit.

4

minor changes in the molecular structure of a glycol ether are likely to have a substantial effect on the teratogenic potential of the glycol ether.[3] Exhibit G to Dahlgren Affidavit(Rawlings S.J. et al. "The Teratogenic Potential of Alkoxy Acids in Post-Implantation Rat Embryo Culture: Structure-Activity Relationships" Toxicology Letters 28:49-58, 1985). There is no summary judgment evidence purporting to connect the specific glycol ethers found in Defendant's product with anencephaly or any other defect in developing human embryos.

Even if it were assumed that identification of the specific glycol ether involved was immaterial to the issue of causation (an assumption not supported by the record) Dr. Dahlgren's affidavit fails to establish that there is a genuine issue of material fact regarding causation. "Scientific evidence and expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment." *Bragdon v. Abbott*, 118 S.Ct. 2196, 2212 (1998). "[T]here is simply too great an analytical gap" between the opinion offered by Dr. Dahlgren and the data he proffered to support his opinions. *General Electric Co. v. Joiner*, 118 S.Ct. 512, 519 (1997).

Dr. Dahlgren relies on the Cordier et al European case-control study[4] to support his conclusions. The experimental group in that study included 984 women with babies with major congenital malformations. The control group of 1,134 women gave birth to infants with no anomalies at birth. Dr. Dahlgren states that this study indicates women who had babies with

---

[3] Neither the specific glycol ethers found in Defendant's product nor their metabolites were included in this study. In fact, none of the compounds studied included a phenyl functional group.

[4] Cordier S. et al. "Congenital Malformations and Maternal Occupational Exposure to Glycol Ethers" Epidemiology 8:356-363, 1997. Exhibit C to Dahlgren Affidavit.

neural tube defects were more likely to have been exposed to unspecified glycol ethers. (Odds Ratio[5] 1.94, 95% CI 1.16 to 3.24). Dahlgren Affidavit, p. 3. At most this study suggests that the women whose fetuses suffered from neural tube defects were more likely than the control group to have been exposed to unspecified glycol ethers. However, neural tube defects are not limited to anencephaly. Neural tube defects include other conditions such as spina bifida. The issue in this case is whether the glycol ethers in Defendant's product cause anencephaly. The results cited by Dr. Dahlgren do not address this issue and have no probative value on the issue presently before the court *See e.g.*, *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 197 (5th Cir. 1996) ("Evidence . . . that suggests a connection between EtO exposure and human lymphatic and hematopoietic cancers, but this is not probative on the causation of brain cancer."); *Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594, 597-98 (9th Cir. 1996) (holding that an expert's reasoning, which concluded from the fact that the drug in question caused some types of birth defects that it also caused hemifacial microsomia, was not scientific); *Mitchell v. Gencorp Inc.*, *supra* at 782-83 (No article showed a supportable link between benzene exposure and the type of leukemia plaintiff suffered).

When the study's analysis was restricted to anencephaly the odds ratio dropped to 1.34. Of the 29 cases of anencephaly seven of the mothers (24%) had been exposed to unspecified glycol ethers in the first trimester. This means that approximately 19% of the women in the

---

[5] The Odds Ratio is the ratio of the odds that one with the "disease" was exposed to the odds that a control (one without the "disease") was exposed. For example if 10% of pregnant women exposed to a glycol ether during the first trimester have babies that develop neural tube defects compared to 5% of such women who have no exposure then the odds ratio is 2.1. An odds ratio of 1 indicates no association. "For most purposes the odds ratio from a case-control study is quite similar to a risk ratio from a cohort study." Reference Manual on Scientific Evidence, 2d Ed., Federal Judicial Center 2000, pp. 167 & 394.

control group (216) had been exposed to glycol ether during the first trimester but delivered normal babies.  Putting aside questions of systematic error[6] these results might be the result of chance or random error.[7]  This is addressed by the confidence interval.  The 95% confidence interval for the odds ratio relative to anencephaly was 0.53-3.37.  Exhibit C to Dahlgren Affidavit, p 360.  Thus, no statistically significant association between exposure to glycol ethers and anencephaly was found because the odds ratio, when adjusted by the confidence interval, includes 1.0.  *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 312 (5th Cir. 1989); *See also* Reference Manual on Scientific Evidence, 2d Ed., Federal Judicial Center 2000, p. 389.  A followup study in the Slovak Republic was unable to find a statistical association between glycol ether exposure and neural tube defects.[8]

Another study relied on by Dr. Dahlgren  looked for an association between exposure to nonspecific glycol ethers and neural tube defects (including anencephaly, spinal bifida and encephalocele).[9]  No attempt was made to find any association to anencephaly specifically.  There were 225 case women and 378 control women.  Seven of the case women were thought to

---

[6] The authors acknowledge that occupational exposure to solvents other than glycol ethers is a potential confounder.  They also stated: "We cannot, however, exclude the possibility that, in our study, glycol ether exposure acts as a marker of exposure to a wider range of occupational exposures involved in cleaning tasks, use of cosmetics, etc."  Exhibit C to Dahlgren Affidavit, p 362.

[7] A coin being flipped ten times and coming up heads six times is an illustration of random error.

[8] Cordier et al. "Congenital Malformations and Maternal Exposure to Glycol Ethers in the Slovak Republic" Epidemiology 12:592-593, 2001.  Exhibit D to Dahlgren Affidavit, Table 1.

[9] Brender, J. et al. "Parental Occupation and Neural Tube Defect–Affected Pregnancies Among Mexican Americans" JOEM 44:1-11, 2002.  Exhibit E to Dahlgren Affidavit.

have had occupational exposure to a glycol ether compared to none of the control women. From this it was concluded that case women were more likely to have had occupational exposures to glycol ethers than control women. (odds ratio infinity with confidence interval of 1.8 to infinity).[10] However, the case women were also more likely to have had occupational exposures to solvents (odds ratio infinity with confidence interval of 2.4 to infinity) and the case women were more likely to have worked in cleaning (odds ratio 9.5 with confidence interval of 1.1-82.2). The study's results also indicated that case women were three times more likely to work in health care than control women although the confidence interval was 1.0-9.0. This study also notes that a previous study had found that women employed in nursing occupations were twice as likely as control women to have offspring with anencephaly or spina bifida. Exhibit E to Dahlgren Affidavit, p 7.

Dr. Dahlgren also relied on the report of a study of factory workers from a particular factory in Mexico that worked, over 20 years ago, in direct contact with two organic solvents: ethylene glycol (not a glycol ether) and 2-ME (referred to as methyl cellosolve in the report).[11] This epidemiological study looked for an association between a certain phenotype (a certain peculiar facial feature) and exposure of the mothers to the specific combination of organic solvents. There was no attempt to associate exposure with anencephaly. Animal experiments

---

[10] The report states: "It should be noted that although several risk estimates associated with these occupational exposures appeared quite high, only a small proportion of women had these workplace exposures. If the maternal occupational associations found are real, these exposures would account for about 9% of the NTDs found in this Mexican-American border population." Exhibit E to Dahlgren Affidavit, p. 8.

[11] Saavedra, D. et al. "Industrial Contamination with Glycol Ethers Resulting in Teratogenic Damage" Annals NY Acad. of Sciences, 1997. Exhibit F to Dahlgren Affidavit.

were also performed on 90 rats which involved administering relatively large internal doses of 2-ME to one experimental group and ethylene glycol to another experimental group. Fetuses were delivered after 21 days gestation and examined. Central nervous system abnormalities were found to be more severe in the ethylene glycol group. There is no effort to associate the administration of 2-ME to anencephaly. Animal studies have "very limited usefulness," in any event. *Allen v. Pennsylvania Engineering Corp.*, *supra* at 197; *Brock v. Merrell Dow Pharmaceuticals, Inc.*, *supra* at 313. This "far-removed" animal study does nothing to help establish that the glycol ethers found in Defendant's product causes anencephaly in humans.[12] *See General Electric Co. v. Joiner*, supra at 518.

Finally, Dr. Dahlgren relies on a report of the World Health Organization, 1-Methoxyethanol, 2-Ethoxyethanol and Their Acetates.[13] This report considers only 2-ME and 2-EE, and their acetate esters. Id. at 11. It contains no information relative to the specific glycol ethers found in Defendant's product. Further, it does not purport to make any association between exposure to glycol ethers and anencephaly in humans. Moreover, even absent these obvious limitations, such a report is of questionable value in establishing causation in a tort suit. *Allen v. Pennsylvania Engineering Corp.*, supra at 198.

In sum, the studies and reports relied upon by Dr. Dahlgren, whether considered

---

[12] Exhibit G to Dr. Dahlgren's affidavit is also a report on the teratogenic potential of alkoxy acids in post-implantation rat embryo culture. It too fails to support Dr. Dahlgren's opinion. In addition to the questionable probative value of animal studies in general this study did not involve the specific glycol ethers found in Defendant's product. In fact, it suggests that relatively small differences in the glycol ether molecule can have a significant effect on the teratogenic potential of the active metobolite of a glycol ether at least in rat embryos. It also makes no effort to associate glycol ether exposure to anencephaly.

[13] Exhibit F to Dahlgren Affidavit.

9

individually or in combination, fail to support his conclusion that exposure to the glycol ethers found in Defendant's product causes anencephaly. Thus, Plaintiffs have failed to establish that there is a genuine issue of material fact relative to causation. Accordingly, the motion is granted and Plaintiffs' claims are dismissed with prejudice.

     THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 5th day of July, 2005.

_____
ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE